**Karen B. MASTERS, Plaintiff–Appellee,**

v.

**Bobby G. CROUCH, et al.,
Defendants–Appellants.**

**No. 88–5477.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 31, 1989.

Decided April 18, 1989.

Gregory A. Bolzle (argued), Woodward, Hobson & Fulton, Louisville, Ky., for plaintiff-appellee.

N. Scott Lilly, Asst. Co. Atty., argued, Louisville, Ky., for defendants-appellants.

Before MERRITT and MILBURN, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This action under 42 U.S.C. § 1983 presents two claims of constitutional violations in connection with the plaintiff's arrest and detention. The plaintiff's first claim is that the arresting officer and detention personnel violated her Fourteenth Amendment right not to be deprived of liberty without due process of law by failing to investigate sufficiently to determine whether a warrant for her arrest had been issued by mistake. Her other claim is that a strip search of the plaintiff at the Jefferson County jail was unreasonable, and therefore violated the Fourth Amendment. The defendants, officers and employees of Jefferson County, Kentucky, filed a motion to dismiss on the basis of qualified immunity and for failure to state a claim. The district court denied the defendants' motion, and this appeal was brought pursuant to 28 U.S.C. § 1291. *Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985). We affirm in part, reverse in part, and remand for further proceedings.

## I.

The facts as stated in the complaint are treated as true. All events occurred in 1986. On July 31 Karen Masters, a resi-

dent of Jefferson County, received two traffic tickets—one for operating an automobile with expired registration plates, and the other for failure to maintain auto insurance. As directed by the citation, Mrs. Masters appeared before the Jefferson District Court at a neighborhood government center on August 21 at 7:00 p.m., and pled not guilty. After a second appearance the court directed her to appear before Division 102 of the District Court at the downtown justice center on October 23 at 9:00 a.m. A deputy sheriff in attendance gave the plaintiff a "reminder card" containing this information. However, the plaintiff's name did not appear on the card. By mistake, the judge who presided at the second appearance recorded the plaintiff's next appearance date as October 16 rather than October 23.

On October 21, at about 3:00 p.m. the defendant Barrows, a county police officer, arrested Mrs. Masters at her home for failure to appear in court on October 16. The plaintiff protested that her appearance date was October 23, not October 16, and showed Barrows the reminder card. The officer confirmed the existence of the arrest warrant for Karen Masters and refused the plaintiff's request to call an attorney. Officer Barrows took the plaintiff and her two young children in a squad car to the home of Mrs. Masters' mother, where the children were left. He then took the plaintiff to a public parking lot and delivered her to another officer who handcuffed her before transporting her to the hall of corrections. Throughout these events Mrs. Masters repeatedly advised the officers that there was a mistake, that she was not required to appear in court until October 23.

At the corrections building the plaintiff was required to remove her shoes and empty her pockets and then was "frisked" by a female attendant. While Mrs. Masters was in a "holding room" a different female attendant ordered her to open her blouse. This search occurred in front of a window in the holding room, in plain view of other persons. Approximately four hours after her arrest the plaintiff was handcuffed to another woman and taken to a room on the

third floor of the Jefferson County jail. At that point, still another female attendant subjected the plaintiff to a strip search over her continued protestations of mistake. The plaintiff was required "to remove all of her clothing except her underpants and to turn around, drop her underpants, bend over and expose her rectum." After putting on a jail dress, the plaintiff was lodged in a jail cell with other persons. Later in the evening she was released on her own recognizance and ordered to report to court at 9:00 a.m. the next day. The following morning the presiding judge acknowledged the recording error that led to the issuance of the arrest warrant.

## II.

In the U.S. District Court the plaintiff sought damages under § 1983 for alleged constitutional violations and under various state laws as pendent claims. She also requested a declaratory judgment and a permanent injunction to prohibit enforcement of the laws and policies under which she was arrested, detained and searched. The defendants' qualified immunity defense was based on their contention that at the time of the events complained of there was no "clearly established law" holding any of the defendants' acts unconstitutional.

The district court recognized that public officials and employees are immune from suits seeking damages under § 1983 for acts performed under color of law unless it has been clearly established that such acts deprive the plaintiff of rights secured by the Constitution or laws of the United States. Interpreting Supreme Court authority exonerating an officer who executes an arrest warrant from making an independent investigation of *every* claim of innocence, the district court concluded that there is an implied duty to make an investigation in some cases. The court held that, in this case, because Mrs. Masters had documentary evidence that the warrant had been issued by mistake, the officer had a duty to investigate and verify the validity of the warrant.

The district court found that the strip search was conducted pursuant to provisions of a consent decree previously entered by another division of the court in a class action, *Tate v. Frey*, W.D.Ky. No. 75–00031–L(A). The consent decree, entered as a "Stipulation for Settlement of Class Action" on October 1, 1985, provided in paragraph XXIII that the defendant Jefferson County authorities agreed to establish policies addressing the search of inmates and inmates' property. It then set forth guidelines for those policies. The particular policy under which Mrs. Masters was searched provides:

All inmates will be thoroughly searched each time an inmate passes from one security area to another, being prepared for transportation both between floors and externally, and upon admission to the Department. All newly admitted inmates to the Department will be frisked searched upon arrival to the Department and strip searched immediately prior to the movement of the inmate to rear security, female section or other areas of the Department.

The district court found that, in applying this policy, the defendants are required to balance the interest of a detainee in remaining free from the serious personal intrusion inherent in a strip search against the interest of the authorities in maintaining security within the jail. Since Mrs. Masters was arrested and detained on minor traffic offenses not normally associated with weapons or other contraband, and no effort was made to determine whether any grounds existed for believing her movement from one area of the jail to another involved a security risk, the complaint stated a claim for relief. Applying objective standards, the court further found that the plaintiff's right not to be subjected to a strip search under the facts of this case was clearly established. Thus, the district court denied the defendants' claims of qualified immunity.

## III.

### A.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The standard to be applied in deciding a claim of qualified immunity is one of "objective reasonableness." *Id.* The Court reiterated both the rule and the standard in *Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984), and added that "[n]o other 'circumstances' are relevant to the issue of qualified immunity." *Id.* Further refining the scope of inquiry to be conducted by a court in deciding a claim of qualified immunity, the Supreme Court cautioned in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), against identifying a clearly established rule of law at a level of broad generality. Rather, the right allegedly violated must have been clearly established in a "more particularized, and hence more relevant, sense." 107 S.Ct. at 3039. The Court explained its "more particularized" requirement as follows:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell*, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n. 12; but it is to say that in the light of preexisting law the unlawfulness must be apparent. See *e.g., Malley* [*v. Briggs* ], *supra*, 475 U.S. [335], at 344–345, 106 S.Ct. [1092], at [1098, 89 L.Ed.2d 271 (1986) ]; *Mitchell, supra*, 472 U.S., at 528, 105 S.Ct., at 2816; *Davis, supra*, 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019.

*Id.*

In describing the circumstances under which we will hold that a constitutional right is clearly established, this court has formulated a rule which requires us to look first to decisions of the Supreme Court,

then to decisions of this court and other courts within this circuit, and finally to decisions of other circuits. *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171 (6th Cir.1988); *Robinson v. Bibb*, 840 F.2d 349 (6th Cir.1988); *Davis v. Holly*, 835 F.2d 1175 (6th Cir.1987).

### B.

On appeal the defendants rely squarely on *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), to negate the claim that the plaintiff had a clearly established right not to be arrested and detained without an independent investigation of her claim of mistake. In *Baker* the Supreme Court held that an officer making an arrest on the basis of a facially valid warrant is under no duty "to investigate independently every claim of innocence." *Id.* at 145–46, 99 S.Ct. at 2695.

Agreeing with the district court, the plaintiff argues that the reminder card setting her appearance in Jefferson District Court for October 23 was documentary evidence supporting her claim of mistake. This evidence, the plaintiff maintains, was sufficient to take her case outside the general rule that such an investigation is not required in *every* case. Because Mrs. Masters had supporting evidence that the arrested plaintiff in *Baker* did not possess, the officer was required to investigate and determine the true facts.

The defendants approach the strip search issue differently. They argue that there was no clearly established right for a pretrial detainee in the Jefferson County jail to be free of a strip search before being moved from the holding area to a cell. On the contrary, they maintain, the consent decree in *Tate v. Frey* authorized such searches and this court, in *Dobrowolskyj v. Jefferson County*, 823 F.2d 955 (6th Cir. 1987), upheld the constitutionality of the search policy. They contend that the Jefferson County policy passes muster under the reasoning of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which upheld a policy of the New York City Metropolitan Correctional Center that required body-cavity searches of inmates following contact visits with persons from outside the institution.

The plaintiff responds that *Bell v. Wolfish* prescribed a balancing of the competing interests of the detainee and the authorities, and held the *particular* search in that case permissible because the need for the search outweighed the plaintiff's right to be free of such an intrusion. *Bell v. Wolfish* did not give carte blanche approval to a practice of strip searching all pretrial detainees. In applying the limitations imposed by the Supreme Court, the plaintiff contends, no published opinion of any court has upheld the constitutionality of a policy which permits routine strip searches of persons arrested for minor offenses. Thus, she argues, the right of a person in her position to be free of such a search was clearly established, in the "particularized sense" required by *Anderson v. Creighton.*

### IV.

We believe the district court erred in concluding that clearly established law required the defendants to investigate sufficiently to determine that the arrest warrant had been mistakenly issued on the basis of an error by a judge. The warrant named the plaintiff, who was the person charged by the Jefferson County police and gave her correct address. The warrant was valid on its face, and Barrows did make a call to verify that it was still outstanding. The "reminder card" did not bear Mrs. Masters' name or any description of a charge, but merely showed that some proceedings would take place in Courtroom No. 102 at 9:00 a.m. on October 23, 1986. While this document certainly strengthened her claim of mistake, it was not sufficient to require further investigation. Since the error was made by the judge who set the date, not by the person who issued the warrant, it is unlikely that the mistake would have been discovered by any investigation that did not include examining that particular judge's daily records.

Of course, a more sensitive group of public employees might have made the additional investigation, but the Constitution did not require it. *Baker v. McCollan* is

the controlling case. There a man was arrested and held for several days under a warrant that was valid on its face. The warrant was intended for McCollan's brother, however, and McCollan was released when the mistake was discovered. The brother had given the police McCollan's driver's license when arrested. The Supreme Court found that McCollan's claim was based on the alleged intentional failure of the authorities to investigate his claim of innocence after he was incarcerated. The decision states a rule, however, with respect to the duty to investigate that applies to an arresting officer as well as to custodians following arrest. The Court pointed out that the Constitution does not guarantee that only the guilty will be arrested; police and correction employees may rely on facially valid arrest warrants even in the face of vehement claims of innocence by reason of mistaken identity or otherwise. 443 U.S. at 145, 99 S.Ct. at 2695.

The district court found an implication in the Supreme Court's statement that an arresting officer is not required to conduct an independent investigation into every claim of innocence, that in exceptional cases such as this one the Constitution does require such an investigation. While the language clearly supports an implication that there may be cases where such an investigation is required, it is not a sufficient statement to satisfy the requirement that the right relied upon must be "clearly established." We have found no case from the Supreme Court or this court holding an arresting officer with a valid warrant, or a custodian, liable in a § 1983 action for arresting and detaining the wrong person for a brief time due to a mistake in identity. In *Coogan v. City of Wixom*, 820 F.2d 170 (6th Cir.1987), we cited *Baker v. McCollan* in holding that a person arrested pursuant to a valid warrant had "no legal basis" for a claim of a constitutional violation. *Id.* at 174.

We vacate the order denying the defendants' motion to dismiss the claim related to the plaintiff's arrest and detention pursuant to the facially valid warrant. This claim will be dismissed upon remand.

## V.

### A.

The strip search in this case consisted of two discrete acts. First, Mrs. Masters was required to expose her breast area, and later she was required to remove all her clothes and undergo the further visual inspection previously described. We consider the two incidents a single search, although either would be treated as a strip search if it occurred alone.

We have found no authority approving a practice of conducting a strip search of a person arrested for a simple traffic violation in the absence of at least reasonable suspicion that the person might be carrying a weapon, illegal drugs, or other contraband. As the defendants have noted, the Supreme Court approved a policy of conducting strip searches of pretrial detainees under certain circumstances in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). These searches were conducted following every contact visit by a detainee with a person from outside the institution. There is an obvious risk that such a visit may be used to introduce contraband into a penal institution. While the Court emphasized the wide-ranging deference to be accorded the decisions of correction officials with respect to institutional security, it clearly prescribes a test of reasonableness based upon a balancing of competing interests:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884.

As the court stated in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983), *Bell v. Wolfish* does not validate a blanket policy of strip searching pretrial detainees. *Bell v. Wolfish* authorizes par-

ticularized searches where objective circumstances indicate such searches are needed to maintain institutional security. The *Mary Beth G.* court found that no such need existed for strip searches, including visual inspection of the breast area and body cavities, of female detainees arrested for traffic offenses and other nonviolent misdemeanors. The city's inability to gather evidence proving that female minor offenders in general were security risks demonstrated that the only justification for the policy was institutional convenience—a policy of strip searching all female detainees is easier to administer than one which requires a balancing of interests in each case and an individual determination of need. *Id.* at 1272–73.

In *Mary Beth G.* the court followed its earlier affirmance of a district court decision. See *Tinetti v. Wittke*, 479 F.Supp. 486 (E.D.Wis.1979), *aff'd*, 620 F.2d 160 (7th Cir.1980). In *Tinetti* a woman arrested for speeding was subjected to a visual body cavity search pursuant to a policy that all persons detained in a county jail be subjected to a strip search, regardless of their offense. The district court held that strip searches must be justified by a reasonable belief that they will reveal weapons or instruments of escape or evidence that could be concealed or destroyed. Unlike detainees charged with criminal offenses, the court found there is little reason to believe that persons arrested for traffic violations will conceal weapons or contraband. The policy was unconstitutional because it failed to require any balancing of interests. The court of appeals adopted the district court's opinion.

The defendants seek to justify the strip search with the fact that Mrs. Masters was being moved from the holding area to a cell area on a different floor of the justice center. Several cases have recognized imminent mingling with other inmates as a consideration in the decision whether to strip search a detainee. However, the fact of intermingling alone has never been found to justify such a search without consideration of the nature of the offense and the question of whether there is any reasonable basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution.

In *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied sub nom. Clements v. Logan*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982), the plaintiff was arrested for driving while intoxicated and ordered to be held for four hours or until released to a responsible person. She was taken to a holding area and subjected to a visual strip search. In reversing a directed verdict for the defendants the court of appeals found that the search was unrelated to any discernible security needs and could not reasonably be thought justified when balanced against the nature of the intrusion. The court listed four factors that led to its conclusion: (1) the plaintiff would not be intermingled with the general jail population; (2) the offense, although not a minor traffic violation, was not one usually associated with the possession of weapons or contraband; (3) there was no cause to believe that this particular detainee might possess either; and (4) when the search was conducted the plaintiff had been at the detention center for one and one-half hours without even a pat down.

The facts in *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984), are similar in many respects to those in the present case. The plaintiff paid a fine for a traffic violation. When he was stopped later for having an expired inspection sticker the arresting officer was told by police headquarters that there was an outstanding bench warrant for the plaintiff's arrest. In fact, the warrant had been withdrawn by the court. After being fingerprinted and patted down the plaintiff was subjected to a visual strip search before being transferred "upstairs" to a prison area. The search was conducted in an area where 10 or 12 people were milling about. The court of appeals held the search unconstitutional upon balancing the interests of the parties, tracking the reasoning of *Logan* and *Tinetti*. It found that the plaintiff's intermingling with the general prison population was the only "conceivable justification" for the strip search. The court stated that "intermingling is only one factor to consider in judg-

ing the constitutionality of a strip search." *Id.* at 394. Opposing this single factor were other factors that led the court to find that no circumstances indicated that the plaintiff might possess either a weapon or drugs.

*Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985), applied the prescribed balancing test and held unconstitutional a policy requiring all persons booked into a county jail to be strip searched. In doing so the court declared that "arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease." *Id.* at 615. The court discounted the defendants' reliance on the fact that temporary detainees were intermingled with the general jail population as justification for the search. It found that "such intermingling is both limited and avoidable." *Id.* at 619.

### B.

■ No decision of this court has specifically balanced the rights of arrestees for minor offenses against a practice of conducting strip searches. However, in upholding a visual body cavity search in *Dufrin v. Spreen,* 712 F.2d 1084 (6th Cir.1983), we followed *Bell v. Wolfish* by balancing the competing interests. Factors supporting the search were that the plaintiff was arrested for felonious assault, a felony and "class of crime of which violence is an element," and that because of jail conditions the plaintiff "would ultimately come into contact with the general jail population." *Id.* at 1087. The *Dufrin* court carefully distinguished *Tinetti* and *Logan* and other cases cited by the plaintiff on the ground that "they have invariably involved misdemeanors, traffic offenses, or similar minor offenses not normally associated with weapons or contraband." *Id.* at 1088. Thus, we indicated that a combination of circumstances justified the search. Considering *Dufrin* along with decisions from other circuits such as *Hill v. Bogans* and

*Giles v. Ackerman,* it was clearly established in October 1986 that authorities may not strip search persons arrested for traffic violations and nonviolent minor offenses solely because such persons ultimately will intermingle with the general population at a jail when there were no circumstances to support a reasonable belief that the detainee will carry weapons or other contraband into the jail. It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates. There is an obvious threat to institutional security. However, normally no such threat exists when the detainee is charged with a traffic violation or other nonviolent minor offense.

■ The decisions of all the federal courts of appeals that have considered the issue reached the same conclusion: a strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable. We believe the right of such a person to be free of such a search was "clearly established" on October 21, 1986. The single fact that Mrs. Masters, for some reason, would come into contact with other prisoners was not sufficient justification for the search in this case. It did not outweigh the other factors negating any claim that such a search was reasonable in this case.

### C.

■ The defendants cite the consent decree in *Tate v. Frey* and argue that Mrs. Masters is precluded by that decree from challenging the strip search policy as it was applied to her. Federal courts move very cautiously when asked to give preclusive effect to consent decrees. As stated by Professor Moore, consent judgments "should not be given conclusive effect under the doctrine of collateral estoppel, although they are res judicata as to the causes of action adjudged; and may in some instances, by virtue of the parties'

intent, be given conclusive effect as to the issues involved." 1 B.J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.443[3] at 768 (2d ed. 1988). See *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 539 (5th Cir. 1978) ("Whatever type of repose is sought to be invoked as a result of a judicial consent decree, a court should take into account the fact that it was rendered by consent and determine its impact by the issues actually intended to be precluded by the parties.").

The defendants' reliance on the consent decree in *Tate v. Frey* is misplaced. The consent decree dealt with numerous issues related to conditions in the Jefferson County jail, largely resulting from overcrowding. With respect to searches the decree merely provides that the defendants will establish policies "addressing the search of inmates and inmate's property." The "guidelines" in the consent decree provide for strip searches of all inmates "entering or leaving the security perimeter," all inmates coming into direct contact with a visitor and all other inmates "upon reasonable belief that the inmate may be in possession of contraband." The policy relied upon by the defendants for Mrs. Masters' strip search provides that newly admitted inmates will be strip searched immediately prior to the movement of the inmate to the "rear security, female section."

To hold that the consent decree prevents Mrs. Masters from relying on the clearly established law relating to strip searches of traffic violators and other nonviolent minor offenders would be to accord the decree an unwarranted preclusive effect. There is no showing in the record before us that any party in *Tate v. Frey* was being detained in the Jefferson County jail for a traffic violation or similar nonviolent offense. Nor is there any showing that the issue of the constitutionality of strip searches of such inmates was litigated in *Tate v. Frey*. In *Balbirer v. Austin*, 790 F.2d 1524, 1528 (11th Cir.1986), the court stated that "a consent judgment cannot constitute collateral estoppel unless the party pleading collateral estoppel proves from the record of the prior case or through extrinsic evidence

that the parties intended the consent judgment to operate as a final adjudication of a particular issue." In holding that a consent decree has a preclusive effect only to the extent that it constitutes an agreed adjudication of an issue on the merits, the *Balbirer* court cited *Spilman v. Harvey*, 656 F.2d 224 (6th Cir.1981), along with cases from the Supreme Court and other circuits. The record in this case provides no basis for the defendants' claim that Mrs. Masters is precluded from challenging the strip search.

The defendants seek to support their claim of preclusion by relying on *Dobrowolskyj v. Jefferson County*, 823 F.2d 955 (6th Cir.1987). In *Dobrowolskyj*, we held that the strip search policy was constitutional as applied to a Jefferson County jail detainee who had been arrested and charged with "menacing," an offense normally associated with weapons and other contraband. While we cited the consent decree in *Tate v. Frey* as an indication of the reasonableness of the search policy, we clearly did not give the decree preclusive effect. Rather, we applied the balancing test of *Bell v. Wolfish* and concluded that the *combination of factors*, including the nature of the detainee's offense and the fact that he was about to be moved to a place where he would come into contact with the general jail population justified the search. We certainly did not give the consent decree and strip search policy the interpretation and effect claimed by the defendants here: that the intermingling of Dobrowolskyj, alone, justified the strip search. We carefully distinguished *Tinetti, Logan, Mary Beth G., Hill*, and other decisions concerning strip searches of persons charged with traffic violations and other nonviolent minor offenses. *Id.* at 957. We noted our decision in *Dufrin* and the fact that we had distinguished *Logan* and *Tinetti* in *Dufrin*. *Id.* at 957–58. We stated our holding in *Dobrowolskyj* as follows:

Applying the balancing test from *Bell*, we find that the security interests of the jail outweigh the privacy interests of the inmates *in the circumstances of this*

*case.* Thus, Dobrowolskyj's search was not unreasonable and did not violate the fourth amendment.

823 F.2d at 959 (emphasis added). Nothing in our opinion, least of all the holding, supports the defendants' claim of preclusion.

#### Conclusion

It was clearly established on October 21, 1986, that a pretrial detainee has the right not to be searched unless the reasonableness of such a search is established by "a balancing of the need for the *particular search* against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884 (emphasis added). It was equally clearly established that a person charged only with a traffic violation or nonviolent minor offense may not be subjected to a strip search unless there are reasonable grounds for believing that the particular person might be carrying or concealing weapons or other contraband. The strip search of Mrs. Masters as set forth in the complaint failed the standard of "objective reasonableness," *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 818. Thus, the defendants are not entitled to prevail at this stage of the case on their claim of qualified immunity. The district court correctly denied the motion to dismiss insofar as it related to the Fourth Amendment claim based on the strip search.

#### VI.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings.